FILED
02 OCT 31 PM 1:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
OCT 31 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| LaGAY BEAIRD, both individually and as mother and next friend of JASON BEAIRD, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF ATTALLA, and CHRIS YANCY, in his individual capacity, <br><br> Defendants. | ) ) ) ) ) ) ) ) Civil Action No.: 01-PT-3052-M ) ) ) ) ) ) ) |

**MEMORANDUM OPINION**

This cause comes on to be heard upon Defendant City of Attalla, Alabama ("Attalla") and Officer Khris Yancey's ("Yancey") Motion for Summary Judgment, filed on September 13, 2002.

**FACTS AND PROCEDURAL HISTORY**

Plaintiffs LaGay Beaird and her son Jason Beaird are residents of Calhoun County, Alabama. Attalla is an municipality organized and existing under the laws of Alabama. Yancey is an officer with the City of Attalla police department.

On November 23, 1999, an arrest warrant was issued for Jack Beaird, father of Jason Beaird and ex-husband of LaGay Beaird, for failure to pay restitution as a part of his conviction for driving under the influence of alcohol. *See* Def. Ex. 2. Jack Beaird's known address was 1002 Case Avenue SE ("Case Avenue"). *See* Def. Ex. 3 at 1; Ex. 5. On November 30, 1999, between 2:00 and 2:30 P.M., Yancey went to Case Avenue to execute the warrant. *See* Def. Ex. 3 at 1. Yancey knocked on the door several times, but there was no response. *Id.* at 1-2.

Concluding that no one was home, Yancey went on to another dispatch. *Id.* at 2. Later that afternoon, just before 3:30 P.M., Yancey again drove by Case Avenue. *See* Def. Ex. 3 at 2; Ex. 7. Yancey noticed that the front door to the home was now open. *See* Def. Ex. 3 at 2. Yancey alerted dispatch that he was going to stop at Case Avenue. Officer Ryan Condy ("Condy") was also dispatched to Case Avenue to provide backup. *See* Def. Ex. 3 at 2; Ex. 7. In the time between Yancey's two visits, Jason Beaird had returned to the home, at approximately 3:15 P.M. *See* Def. Ex. 1 at 46.

When Yancey approached the home, Condy had not yet arrived on the scene. *See* Def. Ex. 3 at 2. Yancey approached the home and knocked on the transparent, screen-like door. *Id.* After no one responded, Yancey opened the screen door, announced that he was a police officer, and asked if anyone was home; however, no one responded. *Id.*[1] While Yancey was still standing in the doorway of the home, he saw movement behind the wall dividing the entranceway from the main hallway. *See* Def. Ex. 1 at 56-58; Ex. 3 at 2. Yancey again identified himself as a police officer, and demanded that the person come out where he could see him. *See* Def. Ex. 1 at 62, 84; Ex. 3 at 2. Yancey apparently had his gun out at this point. *See* Pl. Ex. 1 at 57-58. Jason Beaird came out. Yancey did not know who Jason Beaird was. Yancey's first impression of Jason Beaird was how big he was. *See* Def. Ex. 3 at 2.[2] Yancey told Jason Beaird to come out on the porch and to turn around. *See* Def. Ex. 1 at 65; Ex. 3 at 2. Yancey then holstered his gun and handcuffed Jason Beaird. *See* Def. Ex. 1 at 66; Ex. 3 at 2.

---

[1] Jason Beaird does not remember this knock and announce. However, he did state that if he had been in the bathroom at the time Yancey had called out, he would not have been able to hear Yancey. *See* Def. Ex. 1 at 83. He did admit to being in the bathroom around that time. *See* Pl. Ex. 1 at 46.

[2] At the time of the incident, Jason Beaird was six feet one inch tall and weighed over two hundred twenty-five pounds. *See* Def. Ex. 1 at 8-9, 48.

2

While handcuffing Jason Beaird, Yancey informed him that he was handcuffing him for his safety and for Yancey's safety. *See* Def. Ex. 1 at 65; Ex. 3 at 2. Only then did Yancey learn that he was handcuffing Jason Beaird, Jack Beaird's son. *See* Def. Ex. 3 at 2. Yancey asked where Jack Beaird was, but Jason Beaird stated that he did not know. *See* Def. Ex. 1 at 84; Ex. 3 at 3.

Yancey stood with Jason Beaird while waiting for backup. *See* Def. Ex. 1 at 67; Ex. 3 at 3. When Condy arrived, the officers asked Jason Beaird for permission to search for Jack Beaird in the home; however, there is some confusion as to whether Jason Beaird consented to the search. *See* Def. Ex. 1 at 70-72; Ex. 3 at 3. Yancey conducted a search of the house. He asserts that the search for Jack Beaird was concluded quickly, taking three minutes at the most, and that the officers never found him. *See* Def. Ex. 3 at 3. At the rear of the house, the officers found the back door open. *See* Def. Ex. 3 at 3. Behind the backyard are some "woods." *See* Def. Ex. 1 at 44. In the backyard was a dog barking in the direction of those woods. The officers thus concluded that Jack Beaird had fled into the woods, and Condy went into the woods to search for him. *See* Def. Ex. 3 at 3. Yancey returned to the front porch. *See* Def. Ex. 1 at 73; Ex. 3 at 3.

Again, Yancey asked Jason Beaird where Jack Beaird was. *See* Def. Ex. 3 at 3. Jason Beaird stated that Jack Beaird might be at work, although he was not certain where his father worked. *Id.* Condy returned to the front porch and reported that he could not find Jack Beaird. *Id.* At this point, Yancey took the handcuffs off Jason Beaird and proceeded to leave the scene. *See* Def. Ex. 1 at 73; Ex. 3 at 3. In total, Yancey was at the scene for approximately sixteen minutes. *See* Def. Ex. 3 at 3; Ex. 7.

For the most part, Plaintiffs agree with this basic factual scenario; however, they also point to some additional facts. According to Jason Beaird, when he first saw Yancey, Yancey

3

had his gun drawn and pointed at him. *See* Pl. Ex. 1 at 57-58. Yancey never told Jason Beaird that he had a warrant to enter the house or to arrest his father. *Id.* at 60-61.[3] Jason Beaird then asked Yancey what he had done wrong, and Yancey replied that "that was a good way to get shot." *Id.* at 62-63. After Jason Beaird came out onto the front porch, Yancey searched him, and again asked whether Jack Beaird was in the house. Jason Beaird again replied no. *Id.* at 65-66. Yancey then handcuffed Jason Beaird and sat him on the front-porch swing. *Id.* at 66-67.

When Condy arrived, he got out of his car, pointed his gun at Jason Beaird's dog, and told Jason that "This dog is dead if he bites me." *Id.* at 66-67. Condy then walked over to a car parked at the house, placed his hand on the hood, and accused Jason Beaird of illegally driving. *Id.* at 70. The officers then told Jason Beaird that they were going into the house, although he could not remember whether he gave the officers permission to do so. *Id.* at 70-72. When they returned, Jason Beaird asked that the handcuffs be taken off. Condy responded that the handcuffs should be left on because Jason Beaird was a "smart ass," but Yancey finally removed the handcuffs, stating that "If I find out you are lying, I'll come back and arrest you." *Id.* at 72-73.

After the officers left, Jason Beaird called his mother, LaGay Beaird, and told her about what had happened. *Id.* at 73. LaGay Beaird states that Jason Beaird was "really upset" when he called. *See* Pl. Ex. 2 at 37. Jason Beaird also told LaGay Beaird that the handcuffs were so

---

[3]Plaintiffs also take issue with the warrant itself. Plaintiffs note that the warrant filed by Defendants is a different warrant than was submitted with Defendants' Motion to Dismiss, the later being undated. *See* Pl. Exs. 5-6. Plaintiffs also note that, according to the warrant, dated November 23, 1999, it was issued for failure to pay restitution that was not due until *January 6, 2000. See* Pl. Ex. 6; Def. Ex. 2 (emphasis added). Moreover, the original court order that required restitution to be paid stated that the restitution was to be paid starting November 1, 1999. Plaintiffs question there being a warrant being issued on November 23, 1999, not even one month after the first payment was due. *See* Pl. Ex. 7. Defendants, in their Reply Brief, filed several other exhibits, trying to show that the warrant was legitimately issued and executed. *See* Def. Reply Br. at 2-5; Def. Exs. 8-13.

4

tight that they caused whelps on his wrists, and that he had to sit on the front porch as school buses went by. *Id.* at 38. LaGay Beaird saw the whelps when she arrived home. *Id.* at 48-49. Also, two of Jason Beaird's neighbors told him that they saw him handcuffed and sitting on the front porch. *See* Pl. Ex. 1 at 77-80.

Plaintiffs sought information about the incident from Attalla, but never received any response. *See* Pl. Exs. 3-4. Plaintiffs then filed this complaint on November 29, 2001. They alleged (1) violation of the Fourth Amendment, (2) violation of procedural due process under the Fourteenth Amendment, (3) violation of substantive due process under the Fourteenth Amendment, and (4) invasion of privacy under Alabama law. Defendants filed a Motion to Dismiss on December 26, 2001. By order dated January 30, 2002, the court dismissed all of the federal claims, except the Fourth Amendment claim against Yancey. Thus, this opinion addresses only the invasion of privacy claim, and the Fourth Amendment claim against Yancey.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts

demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS OF THE PARTIES

### I.     Fourth Amendment Violation (Yancey)

Yancey offers several theories as to why summary judgment should be granted.

#### A.     Lawfully Executed Arrest Warrant

First, Yancey notes, he was executing an arrest warrant; therefore, he could enter the premises if he reasonably believed that the location to be searched was the suspect's dwelling and that the suspect was present at the time. *See United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995). At the time the warrant was executed, the known address of Jack Beaird was at

6

Case Avenue. This was also the address he gave in connection with his DUI arrest. *See* Def. Ex. 5. LaGay Beaird even admitted that Jack Beaird lived at Case Avenue as recently as June 2002. *See* Def. Ex. 4 at 8.[4] When Yancey first drove by Case Avenue, the front door was closed. However, when he passed by again, the front door was open. Thus, it was reasonable for Yancey to believe, under the totality of the circumstances, that Jack Beaird had returned home. After he approached the door, Yancey saw a person near the wall dividing the entranceway from the main hallway. Yancey notes that officers are entitled to consider the possibility that a suspect may know that police are looking for him when ascertaining whether a suspect is at home. *Magluta*, 44 F.3d at 1535. Yancey could thus assume that the person moving about was Jack Beaird trying to hide. *Id.* The fact that Jack Beaird was not home does not make the entry invalid. *See United States v. Woods*, 560 F.2d 660, 665 (5th Cir. 1977). Since the question of whether officers had reason to believe that a suspect was home is a legal one, *Magluta*, 44 F.3d at 1536, the court can grant summary judgment in Yancey's favor.

Also, Yancey notes, the Supreme Court has recognized that third parties can pose a danger to officers attempting to execute an arrest warrant. *See Maryland v. Buie*, 494 U.S. 325 (1990). Thus, officers may briefly detain individuals in the course of executing an arrest warrant. *See Michigan v. Summers*, 452 U.S. 692, 705 (1981). Under the circumstances, Yancey argues, he reasonably believed that there may be a danger to himself and thus had the right to detain Jason Beaird and make a protective sweep of the home.

Plaintiffs counter that there are limits on the ability of an officer to search a premises incident to executing an arrest warrant. Plaintiffs note that in *Chimel v. California*, 395 U.S.

---

[4] In their Reply Brief, Defendants point to other evidence suggesting that although divorced, Jack Beaird resided at Case Avenue. *See* Def. Ex. 4 at 8; Ex. 6.

7

752, 768 (1969), the Supreme Court addressed the issue of a search after an arrest has been made, noting that

> The search here [of defendant's entire home subsequent to his arrest] went far beyond the petitioner's person and the area from which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area.

Plaintiffs also point to *Swint v. City of Wadley*, 51 F.3d 988 (11th Cir. 1995), which quoted and applied this portion of *Chimel*. In *Swift*, the officers, while looking to arrest two drug dealers in a club, searched the property, pointed guns at patrons, and instructed patrons to lie on the floor. The Eleventh Circuit concluded that "[n]o reasonable law enforcement officer in the circumstances presented here could have believed that probable cause existed to search the entire Club and seize all of its occupants." 51 F.3d at 998. *See also Sheth v. Webster*, 145 F.3d 1231 (11th Cir. 1998). Plaintiffs seem to argue that once Jason Beaird was in custody and had informed the officers that Jack Beaird was not present, the officers violated the Fourth Amendment by continuing with the search.

In reply, Yancey distinguishes the cases relied upon by Plaintiffs. Yancey notes that *Chimel* dealt with searches that occur in areas within a subject's immediate control; however, *Buie* dealt with a protective sweep of a home, which Yancey argues is what happened in this case. Yancey also argues that *Swift* is distinguishable. According to Yancey, *Swift* involved a third-party's premises and patrons who were not residents thereof. Here, a residence and one of its occupants were searched. Thus, the rationale of *Swift* does not apply.

    B.    <u>Consent</u>

Next, Yancey argues, he was given consent to search the home. Under Eleventh Circuit

law, a child can legally consent to the search of the home where he resides. *See Lenz v. Winburn*, 51 F.3d 1540, 1548 (11th Cir. 1995). Also, a child, if he possesses common authority over, or other sufficient relationship to, the premises or effects sought to be inspected, can consent to a search of another's property. *Id.* at 1548. According to Yancey, Jason Beaird consented to the search.[5] Given that the search was conducted quickly, it conformed to the consent given by Jason Beaird.

Plaintiffs argue that, even if consent was given, which they do not concede, the consent was given under duress. Plaintiffs note that it is Yancey's burden to prove that the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). This determination is made under a "totality of the circumstances" test. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Under these facts, there is a disputed issue of material fact as to whether Jason Beaird even gave consent, and whether it was freely and voluntarily given.

In reply, Yancey, besides making his original arguments, states that there is no evidence in the record to suggest that *Bumper* has been violated. Rather, the only evidence in the record as to consent suggests that Jason Beaird freely gave consent for Yancey and Condy to enter the house.

C.   Qualified Immunity

Finally, Yancey argues, the Fourth Amendment claims fail because he is entitled to qualified immunity, which is an affirmative defense available to a governmental official sued in his individual capacity. *See Wilson v. Strong*, 156 F.3d 1131, 1135 (11th Cir. 1998). According to Yancey, the test for qualified immunity involves a three-step analysis. First, the specific

---

[5]Yancey contrasts his clear memory of the event with Jason Beaird's inability to recall whether he gave consent or not. *See* Def. Ex. 1 at 71-72. According to Yancey, there is no material dispute on this point.

9

constitutional right must be identified. Here, Yancey argues, Plaintiffs have failed to allege which specific constitutional right was violated. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("Section 1983 is not itself a source of substantive rights."); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 842-43 n.5 (1998) (noting that plaintiffs must "identify the exact contours of the underlying right said to have been violated").

Second, Yancey notes, Plaintiffs must show an actual violation of the identified and specific constitutional right. *See Hope v. Pelzer*, ___ U.S. ___, 122 S. Ct. 2508, 2513 (2002). As explained above, Yancey argues that he did not violate any of Jason Beaird's constitutional rights. Thus, he cannot be held liable.

Finally, assuming that Plaintiffs could identify a specific constitutional right and prove that it had actually been violated, the third step requires the court to determine whether the constitutional right was "clearly established" in a particularized sense, and in the law, at the time the defendant acted. *See Godby v. Montgomery Co. Bd. of Educ.*, 996 F. Supp. 1390, 1400 (M.D. Ala. 1998). This is determined by reference to decisions of the Supreme Court of the United States, the Court of Appeals for the Eleventh Circuit, and, in an appropriate case, the Alabama Supreme Court. *See D'Aguanno v. Gallagher*, 50 F.3d 877, 881 n.6 (11th Cir. 1995). An officer must have "fair warning" that his conduct was unconstitutional. *Hope*, 122 S. Ct. at 2516. Plaintiffs bear the burden of proving that the right was clearly established. *See McMillian v. Johnson*, 88 F.3d 1554, 1562 (11th Cir. 1996). According to Yancey, there is no controlling case law finding a violation of constitutional rights under similar facts. Thus, even if Yancey did violate Jason Beaird's rights, he is entitled to qualified immunity.

Plaintiffs counter with several cases and statutes to show that the Yancey should have

known that he was violating Jason Beaird's Fourth Amendment rights. Alabama, like most states, has a "knock and announce" statute, requiring an officer to knock and announce his presence before entering a home, unless there are exigent circumstances. *See* Ala. Code § 15-5-9; *Houk v. State*, 455 So. 2d 115, 118 (Ala. Crim. App. 1984). When Jason Beaird exited the bathroom, Yancey was already in the doorway with his gun drawn and pointed at Jason Beaird, and told him that asking questions "was a good way to get shot."

Plaintiffs further argue that Alabama law requires officers to use reasonable force in making an arrest, meaning that an officer "is without privilege to use more force than is necessary to accomplish the arrest." *Livingston v. Browder*, 285 So. 2d 923, 927 (Ala. Civ. App. 1973). The Fourth Amendment also provides guidelines as to the amount of appropriate force, requiring the officers to weigh "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Conner*, 490 U.S. 386, 396 (1989). Plaintiffs note that the warrant was issued for failure to pay restitution, not for a violent crime. Moreover, after Jason Beaird put up no resistance, Yancey handcuffed him and left him on the front porch. Jason Beaird was not a suspect, and the officers had no reason to think that he had committed any crime. This creates an issue of fact as to whether the seizure and search of Jason Beaird was so unreasonable that Yancey could not claim qualified immunity. Similarly, the search of the home was unreasonable because Jason Beaird had been secured, had told Yancey that Jack Beaird was not there, and had not given consent, or if he had given consent, had not given it freely and voluntarily.[6]

---

[6]Again, the parties disagree about whether Jason Beaird's failure to remember if he gave consent creates a factual dispute as to that issue.

11

Yancey replies that the reference to the Alabama knock and announce statute is irrelevant, because the undisputed evidence shows that he did not enter the Beaird home until after he spoke with Jason Beaird. *See* Def. Ex. 1 at 58; Ex. 3. Moreover, Yancey argues, he would have had the authority to enter the house if he had chosen to do so. *See Magluta*, 44 F.3d at 1535. Yancey also points out that Plaintiffs have cited no cases with similar facts that have found excessive force by a police officer. Finally, since Plaintiffs did not directly address his qualified immunity defense in their Response Brief, they have conceded that he is entitled to summary judgment on the qualified immunity issue.

II.     **Invasion of Privacy (Yancey and Attalla)**

Yancey and Attalla both offer theories as to why summary judgment is proper.

A.      Failure to State a Claim

According to Defendants, the Alabama Supreme Court has defined the tort of invasion of privacy as the intentional wrongful intrusion into one's private activities in such a manner as to cause outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. *See Carter v. Innisfree Hotel, Inc.*, 661 So. 2d 1174, 1178 (Ala. 1995). Also, the Alabama Supreme Court has explained what "wrongful intrusion" entails. Among other guidelines, the Court has noted that "[t]he thing into which there is an intrusion or prying must be, and be entitled to be, private." *Hogin v. Cottingham*, 533 So. 2d 525, 531 (Ala. 1988). According to Defendants, even if there was an intrusion, nothing intruded upon was entitled to privacy because Yancey had a lawfully executed arrest warrant. Accordingly, any privacy interests that Jason Beaird had must yield to the need to execute the arrest warrant.

B. <u>Immunity</u>

Attalla notes that under Ala. Code § 11-47-190, municipalities are immune from their employee's intentional torts. *See Couch v. City of Sheffield*, 708 So. 2d 144 (Ala. 1998); *Scott v. City of Mountain Brook*, 602 So. 2d 893 (Ala. 1992). The Alabama Supreme Court has defined invasion of privacy as an intentional tort,[7] and Plaintiffs allege that the invasion was intentional. *See* Compl. at ¶ 33. Thus, Attalla cannot be liable. Even if Plaintiffs were claiming negligent invasion of privacy, Alabama law does not recognize such a cause of action. *See Grant v. Dolgen Corp.*, 738 So. 2d 892 (Ala. Civ. App. 1998). Either way, Attalla cannot be held liable under an invasion of privacy theory.

Yancey claims immunity under Ala. Code § 6-5-338, which deems every peace officer an officer of the State of Alabama and awards immunity to all peace officers for performance of their discretionary law enforcement duties. Yancey points to several portions of the Complaint to demonstrate that he was exercising discretion during the events in question. *See, e.g.*, Compl. at ¶ 34(a) (entering the premises); ¶ 34(b) (searching the residence); ¶ 34(c) (pointing a pistol at Jason Beaird); ¶ 15 (instructing Jason Beaird to "freeze"). Yancey also notes that "exercising judgment in the enforcement of the criminal laws of the State is a recognized discretionary function." *Ex parte Tuscaloosa County*, No. CV-95-565, 2000 WL 1273686, at *6 (Ala. Sept. 8, 2000) (quotations omitted). Thus, Yancey is entitled to immunity under Ala. Code § 6-5-338.[8]

Plaintiffs do not directly address Defendants arguments. Rather, they provide a quotation from *K-mart Corp. v. Weston*, 530 So. 2d 736 (Ala. 1988), to the effect that

---

[7]*See Cater and Hogin, supra* at Part II-A.

[8]Attalla notes that since its liability is based on *respondeat superior*, claims against it are barred if Yancey is entitled to immunity. *See Gore v. City of Hoover*, 559 So. 2d 163 (Ala. 1990).

> [The right of privacy] has been defined "as the right of a person to be free from unwarranted publicity," or "the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, *or the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.*"

*Id.* at 739 (quotations omitted) (emphasis added). According to Plaintiffs, the facts as alleged meet this definition, and thus summary judgment on this issue is inappropriate.

In reply, Defendants attempt to distinguish *Weston*. First, they note that *Weston* was decided under the old "scintilla of evidence" rule, while Alabama law now requires "substantial evidence" for a claim to reach the jury. *See* Ala. Code § 12-21-12. Second, they note that *Weston* involved an employee revealing embarrassing information in open public. Here, there was no embarrassing information and no public revelation. Rather, Defendants argue, this case is more like *Key v. Compass Bank, Inc.*, Civ. No. 99-541, 2001 WL 1450657 (Ala. Civ. App. Nov. 16, 2001), which distinguished *Weston* on the grounds that no public accusations and/or revelations were made. *Id.* at *6.[9] Also, besides making their original arguments, Defendants note that the complaint does not allege invasion of privacy against Attalla. *Compare* Compl. at ¶¶ 24, 28, 32 *with* Compl. at ¶ 36. Finally, Defendants argue that since Plaintiffs did not address the immunity defenses, they have conceded that Defendants are entitled to summary judgment on the invasion of privacy claim.

---

[9]Defendants also argue that an invasion of privacy claim cannot be based upon the search, because neither Plaintiff was in the house during the search, so neither Plaintiff can prove what was "intruded upon." They also argue that LaGay Beaird cannot recover under an invasion of privacy theory, because she was not present during the events in question and had no interaction with Yancey or Condy during the events in question.

14

## CONCLUSIONS OF THE COURT

Invasion of Privacy Claim Against Attalla:

The Alabama Supreme Court has defined invasion of privacy as "the *intentional* wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Carter v. Innisfree Hotel, Inc.*, 661 So. 2d 1174, 1178 (Ala. 1995) (emphasis added). In *Grant v. Dolgen Corp.*, 738 So. 2d 892, 896 (Ala. Civ. App. 1998), the court noted that the plaintiff had "failed to cite any case which recognizes a cause of action for negligently and or wantonly . . . invading another's privacy." No case has been cited that recognizes a negligent invasion of privacy. Thus, it appears that Plaintiffs' claim must be based on intentional invasion of privacy. However, municipalities are immune from the intentional torts of their employees. Ala. Code § 11-47-190. *See also Scott v. City of Mountain Brook*, 602 So. 2d 893 (Ala. 1992) ("11-47-190 limits the liability of municipalities to injuries suffered through neglect, carelessness, or unskilfulness of an agent, officer, or employee."). Attalla is not liable as a matter of law.

Fourth Amendment Claim Against Yancey:

This claim must be broken down into the various actions alleged, i.e., (1) entering into the doorway, (2) the search of the house, and (3) pointing the gun at Jason Beaird, the threats and other remarks, and the handcuffing.

 1. Entering the Home

In *United States v. Magluta*, 44 F.3d 1530 (11th Cir. 1995), the Eleventh Circuit cited *Payton v. New York*, 445 U.S. 573 (1980) in discussing the standard for entry into residences to

15

execute an arrest warrant. *Payton* requires a two-part test: (1) there must be a reasonable belief that the location to be entered is the suspect's residence, and (2) the police must have reason to believe that the suspect is in the dwelling. *Magluta*, 44 F.3d at 1533. Here, "reasonable belief" means the "the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality." *Id.* at 1535. In this regard, "courts must be sensitive to common sense factors . . . [including] the possibility that the resident may be aware that police are attempting to ascertain whether or not the resident is at home." *Id.* Also, "This circuit's case law supports [a] practical interpretation of *Payton*." *Id.*

Here, the known address of Jack Beaird was Case Avenue, so the first prong of *Payton* is satisfied. Moreover, the second prong is satisfied, because the first time Yancey passed by the door was closed, but the second time the door was open. Plaintiffs do not dispute these facts. Thus, under a practical, totality of circumstances analysis, Yancey's choice to enter the doorway was reasonable.[10]

2. Search of the House/Woods

The sweep of the house and/or woods was also reasonable. First, under *Magluta*, it is "reasonable to expect a fugitive to hide or flee if possible." *Id.* at 1535-36 (citing *United States v. Beck*, 729 F.2d 1329, 1332 (11th Cir. 1984)). Thus, it would be reasonable for the officers to sweep the house/woods simply by virtue of executing the arrest warrant. Moreover, officers may make a "properly limited protective sweep in conjunction with an in-home arrest warrant when the searching officer possesses a reasonable belief based on specific articulable facts that the area

---

[10]At the very least, his belief was reasonable enough to entitle him to qualified immunity.

to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 337 (1990). Again, this was Jack Beaird's known address, and if officers can assume that suspects are hiding or fleeing, it is reasonable that they can assume that third parties may be lying about the suspect's whereabouts. Yancey asked Jason Beaird several times where Jack Beaird was. The Supreme Court in *Buie* noted that "the risk of danger in the context of an arrest in the home is as great, if not greater than, it is in an on-the-street or roadside investigatory encounter." 494 U.S. at 333. Plaintiffs do not, and cannot, dispute that the sweep was limited and short in duration.[11] The sweep was reasonable under the circumstances.[12]

  3. <u>Pointing the gun, handcuffing, etc.</u>

These allegations are more problematic. Defendants cite *Michigan v. Summers*, 452 U.S. 692 (1981) for the proposition that Yancey had the right to detain Jason Beaird while they searched for Jack Beaird. However, *Summers* involved a search warrant, not an arrest warrant. And even if the officers had the right to detain Jason Beaird, the question is whether Yancey had the right to handcuff him and leave him on the front porch.

Yancey has claimed qualified immunity, and the burden is on Plaintiffs to show that qualified immunity does not apply. *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000). Moreover, qualified immunity is a very strong protection. "Unless a government agent's act is so obviously wrong . . . that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit."

---

[11] The court does not reach the consent issue.

[12] In *Buie*, the Court distinguished *Chimel v. California*, 395 U.S. 752 (1969), which is relied upon by Plaintiffs. *Chimel* is not applicable, since it involved a full blown search as opposed to the sweep involved here.

*Rodriguez v. Farrell*, 280 F.3d 1341, 1345 (11th Cir. 2002). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Sauls*, 206 F.3d at 1165. Knowledge that a citizen has a right to be free from excessive force does not equate with an officer knowing that his force was excessive. *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997). Also, in an excessive force case, "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer . . . to conclude the force was unlawful." *Slicker v. Jackson*, 215 F.3d 1225, 1232 (11th Cir. 2000).

Moreover, excessive force "is judged on a case by case basis from the prospective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." *St. George v. Pinellas County*, 285 F.3d 1334, 1337-38 (11th Cir. 2002). Determining what force is reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake. *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citations omitted). Factors include (1) the need for force, (2) the relationship between the need and the amount of force used, and (3) the extent of any injury inflicted. *Id.* at 1198. Specifically, "Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal." *Farrell*, 280 F.3d at 1352.

There is an initial question of whether Yancey's conduct could reasonably be found to be a constitutional violation. However, the conduct of Yancey was not so egregious as to be obvious to any law enforcement officer; thus, the principle of *Hope v. Pelzer*, ___ U.S. ___, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), in not applicable here. The burden is on the Plaintiffs to call the court's attention to controlling cases with similar facts where a constitutional violation

18

has been found. Thus far, none has been cited.

Invasion of Privacy Claim Against Yancey:

In *Phillips v. Smalley Maintenance Servs., Inc.*, 435 So. 2d 705 (Ala. 1983), the court, in discussing invasion of privacy, quoted from the Restatement (Second) of Torts § 652B, specifically comment b. Comment b states that "the invasion may be physical intrusion into a place in which the plaintiff has secluded himself, as when [he] . . . insists over plaintiff's objection in *entering his home*." (Emphasis added). Thus, this type of conduct may be actionable under some circumstances. However, in regards to the search/sweep, Yancey was executing an arrest warrant, which trumps any such privacy interest, or else every officer executing a warrant could be sued for invasion of privacy.

Plaintiffs also claim invasion of privacy surrounding Yancey's (1) pointing the gun in Jason Beaird's face, and (2) handcuffing him on the front porch so that neighbors could see him. Yancey asserts that he exercised discretion in doing these things, and thus he claims immunity under Ala. Code § 6-5-338. He is also correct in noting that "exercising judgment in the enforcement of the criminal laws of the State" is a recognized discretionary function. *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000). However, that immunity does not apply when a officer acts "willfully, maliciously, fraudulently, or in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.* at 402. There is no reasonable inference that Yancey's conduct fit the described exception on this issue.

The court presently concludes that the Motion for Summary Judgement should be granted as to all claims except as to the Fourth Amendment claims, other than the unreasonable search claim(s). The court will reserve ruling on the Fourth Amendment claim(s) of Jason Beaird, other

than the unreasonable search claim(s). The Plaintiffs are given ten (10) days to submit to the court highlighted copies of controlling cases which purport to refute Yancey's qualified immunity defense with reference to any such claims. The Plaintiffs will clearly define the Fourth Amendment claims of Jason Beaird against Yancey and clearly cite relied upon controlling cases. The Defendants will have seven (7) days to respond. The Plaintiffs will then have seven (7) days to reply.

This __31st__ day of October, 2002.

/s/ Robert B. Propst
ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

The plaintiffs have also raised questions about the bona fides of the arrest warrant - The parties will also address this issue - RBP